## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

VERIZON WIRELESS (VAW) LLC
d/b/a/ VERIZON WIRELESS,

　　　　　　*Plaintiff,*


v.　　　　　　　　　　　　　　　　　Case No.  11-2374-EFM


UNIFIED GOVERNMENT OF
WYANDOTTE COUNTY/KANSAS CITY,
KANSAS,

　　　　　　*Defendant.*


## MEMORANDUM AND ORDER

The parties in this case have each filed motions for summary judgment.  Plaintiff Verizon

Wireless asks that the Court grant injunctive relief requiring Defendant Unified Government to

approve Verizon's application for a special use permit because the Unified Government's denial

of the application violates the Federal Telecommunications Act of 1996.  Specifically, Verizon

argues that the denial was (1) not supported by substantial evidence in the record, and (2) was

based in part on perceived environmental effects of radiofrequency emissions.  Conversely, the

Unified Government asks the Court for summary judgment in its favor on the grounds that

Verizon failed to satisfy the requirements for a special use permit as set out in the Unified

Government's Code of Ordinance.  Because the denial of Verizon's application was not based on

substantial evidence, the Court grants Verizon's motion for summary judgment (Doc. 20) and

denies the Unified Government's motion for summary judgment (Doc. 24).[1]

## I.    Factual and Procedural Background

Plaintiff Verizon Wireless is a Delaware limited liability company licensed to conduct

business in Kansas.    Defendant Unified Government is the consolidated government of

Wyandotte County, Kansas, and the City of Kansas City, Kansas.   Verizon is in the wireless

telecommunications industry and provides wireless telecommunications services to the public.

Verizon holds a license from the Federal Communications Commission to provide such services

in Wyandotte County, Kansas.

Like other wireless communications systems, Verizon relies on a network of wireless

communication facilities ("WCF"), which are comprised of radio antennae and other electronics

that receive and transmit low-power radio signals to and from mobile wireless handsets.   A

coverage gap exists in Verizon's wireless coverage in and around certain areas of Wyandotte

County.  To remedy the coverage gap, Verizon considered and investigated available locations to

find a suitable site for a new WCF.

Section 27-593(a)(30)(k)(a)(1) of the Unified Government's Code of Ordinance ("the

Code") states:

> No new communication tower shall be permitted unless the applicant
> demonstrates, based on substantial evidence and to the reasonable satisfaction of
> the city, that no existing communication tower or other collocation structure can
> accommodate the wireless service provider's proposed wireless communication
> facility.   The applicant for a communication tower must present . . . [a]

---

[1]     In its complaint, Verizon seeks relief on the grounds that the Unified Government committed four
violations of the TCA.  As explained in Part II.B, any violation of the TCA permits the Court to grant the relief
requested.  Therefore, granting summary judgment for Verizon on either of its arguments disposes of the case in its
entirety.

> collocation study documenting the efforts of the wireless service provider to locate on existing structures within the area of deficient service.

Consistent with its typical practices, Verizon first targeted existing towers and structures as a potential collocation site to minimize the cost of constructing a new wireless facility.  The first potential collocation site that Verizon identified was a water tower located at 1415 North 40th Street.  That tower is owned by the Board of Public Utilities ("BPU"), an administrative agency of the Unified Government of Wyandotte County that is responsible for providing water and electric service to parts of the county.  Verizon entered negotiations with the BPU in the fall of 2009 to lease space on the water tower for collocation of Verizon's antennae and equipment.  The BPU's proposed lease terms were consistent with terms found in its leases with other wireless providers.  Verizon, however, found the BPU's proposed lease terms to be unacceptable on several grounds, including Verizon's belief that the monthly rent exceeded the market rate for wireless providers in the Kansas City area.

After failing to negotiate mutually-acceptable lease terms with the BPU, Verizon decided to build a new WCF and entered into a lease agreement with the owner of property located at 1500 North 38th Street, Kansas City, Kansas 66102.  The proposed site is currently zoned as "C-1" limited business district property under the Unified Government's zoning regulations.  Under section 27-593(a)(30) of the Code, "stealth" wireless communication towers that are 80–199 feet tall are permitted on commercially-zoned properties, including C-1 properties, upon issuance of a special use permit.

On June 25, 2010, Verizon submitted an application for a special use permit to construct, in accordance with all federal, state, and local laws, a new WCF at the North 38th Street location.  Verizon's ultimate design proposed construction of a 120-foot stealth monopole tower

capable of accommodating up to three wireless carriers.[2]  With its application, Verizon submitted a letter from its counsel, detailing the failed negotiations between Verizon and the BPU.  Verizon also held a neighborhood meeting regarding the proposed WFC, and none of the attendees expressed opposition to the project.

Verizon's application was scheduled to be heard by the Unified Government's Planning Commission in August 2010, but was rescheduled several times when Verizon renewed negotiations with the BPU to collocate on the water tower.  On October 29, 2010, Verizon's counsel e-mailed the BPU to state that Verizon believed the parties were too far apart to reach an agreement.   Verizon's application was nonetheless continued from following Planning Commission meetings while the Commission's Planning Staff and city management attempted negotiations with the BPU.

On February 14, 2011, the Planning Staff issued a report to the Unified Government Planning Commission recommending approval of Verizon's application for a special use permit. The report stated that Verizon met the ordinance requirements for the permit.  The Planning Staff also stated in the report: "[Verizon] made several attempts to negotiate with the Board of Public Utilities to be on a water tower nearby.  If the staff felt like [Verizon] did not have valid issues with the negotiation, we would likely have a different opinion on this case."[3]

The Planning Commission considered Verizon's application at a regularly-scheduled public hearing on February 14, 2011.  The only attendees to express opposition to Verizon's

---

[2]     On November 8, 2010, the Planning Staff of the Unified Government's Planning Commission issued a report to the Planning Commission recommending denial of the Application because the original design for the tower did not qualify as a "stealth" tower as defined in the Code.  Verizon asked for a continuance to permit Verizon time to modify the tower's design.

[3]     Planning Comm'n Staff Report (2/14/11), Doc. No. 17-3, at 4.

application were representatives from the BPU.  The Planning Commission voted 9 to 1 to recommend approval of Verizon's application for a special use permit.

The Board of Commissioners for the Unified Government of Wyandotte County then considered Verizon's application at a hearing on March 3, 2011.  There was no public opposition to the application at that time.  There was, however, a surprisingly high degree of hostility from several of the commissioners towards Verizon's counsel, as well as frequent lamentations about the revenue the government would lose if Verizon did not enter a lease with the BPU.  The Board of Commissioners voted to remand Verizon's application to the Planning Commission to (1) require Verizon to continue negotiations with the BPU, (2) determine whether mediation was appropriate, and (3) determine whether the proposed tower could be built on the same site as the water tower.

The BPU determined that there was not enough ground space at the water tower site to construct Verizon's proposed tower.  On April 11, 2011, following a second recommendation from the Planning Staff, the Planning Commission voted 8 to 1 to recommend approval of Verizon's application for a special use permit.  At the request of the Planning Staff, Verizon submitted a letter in which it estimated that the proposed lease from the BPU exceeded the lease terms at the proposed site by $1,126,591.00.[4]

On April 28, 2011, the Board of Commissioners again considered Verizon's application, and this time voted to continue the application so that staff could research whether the BPU water tower qualified as a "communication tower" under the Code.  The Planning Staff issued a third report on June 2, 2011, finding that the BPU water tower was not a "communication tower"

---

[4]   The Unified Government contests Verizon's calculations contained within that letter, arguing that Verizon did not take into account the cost of constructing the new tower.

-5-

as defined in the Code.  The Planning Staff then recommended that the Board of Commissioners

consider expanding the definition to include structures like the water tower, stating:

> The cellular industry and the BPU must come to some resolution.  The
> community is bearing the aesthetic brunt of an unnecessary new tower because a
> lease could not be negotiated.  Due to the strict definition of a cell tower, the
> citizens are left holding the bag (a new tower and reduced revenue to [the] BPU).[5]

The Board of Commissioners reviewed Verizon's application again on June 2, 2011.  At

that hearing, the commissioners and the Deputy Chief Counsel for the Unified Government,

Delia York, engaged in the following exchange regarding radio frequency emission:[6]

> COMMISSIONER TARENCE MADDOX: . . . I'm elected in the fourth
> district in which you guys seek to run, I guess, the wire.  The last couple of weeks
> I've just called on the neighborhood associations in that area about the radiation
> and different things like that in the area, a lot that comes from cell towers such as
> radiation causes dizziness—cancer, sleepiness, dizziness.
>      . . . I just reached out to constituents and asked them what they thought
> about extra wires and extra radiation above their heads, and many of them said no.
> And so when I vote—if we vote tonight and I say nay, I want you to understand
> that's where I'm coming from.
>      I represent the citizens who gave their input about the radiation above their
> heads and the constant growing—you know, we can say there isn't much there.
> But if it continues to grow, that becomes an issue.  So I will vote no based on
> what the constituents said.
>
>      MS. YORK:   I understand Commissioner Maddox is new on the
> commission.   And we've talked about some of the things that the
> Telecommunications Act allows local government to do and factors on which
> they base their decision.  I just want to make it very clear that Section 704 of the
> act does not allow us, as a local government, to base a decision on the
> environmental effects of radiofrequency emission to the extent that the facilities
> comply with the commission's regulations concerning such emission.  So I want
> to just caution members of the commission that decisions cannot be based on
> radiofrequency emission.

---

[5]    Planning Comm'n Staff Report (2/14/11), Doc. No. 17-3, at 4.

[6]    Mayor Joe Reardon granted all speakers the floor by stating their name.  These introductions and any
corresponding responses to the Mayor have been excluded from the following excerpt.

COMMISSIONER ANN BRANDAU-MURGIA: . . . [W]hat Commissioner Maddox stated is true. We're elected by people, and we're supposed to work for them and vote in accordance with what they want.

So I guess legally, are we in trouble legally if—you know, and I want to support Commissioner Maddux. So are we in trouble legally if we vote against this?

MS. YORK: The act specifically prohibits the local and the state governing bodies from making decisions based on radiofrequency emissions. And until there are studies that are accepted by the court, if you will, we're bound by that.

COMMISSIONER MURGIA: [D]oes the law not permit politicians to vote the way their people want them to?

MS. YORK: Well, this particular federal act has a specific prohibition. . . . That you cannot—you can't base your decision to allow this wireless facility on radiofrequency emission.

COMMISSIONER MURGIA: What if we are basing it on the way it looks?

MS. YORK: Well, certainly you are allowed to explore all of the Golden factors in making your decision. You need to make your decision based on the substantial evidence that's before you. I'm just cautioning you, there's a specific prohibition in the act with respect to the RF emissions.

COMMISSIONER MURGIA: So I'll go back to one of my other original questions. Is this like one of those hearings where we have to—where we really don't have a choice, that it's just—that no matter what they bring in front of us, we have to—

MS. YORK: No, I'm not suggesting that at all. I'm recommending to you that you look through the Golden factors, you consider the professional staff that has made their recommendations, you consider the opinions of whatever neighbors might be present or the constituencies that you've heard from. You're certainly allowed to do that. I'm simply saying there is a very specific prohibition in the act for basing decisions on RF emissions.

COMMISSIONER NATHANIEL BARNES: . . . [I]f you chose to vote no because your constituency felt something about the radiofrequencies, but that's the wishes of the community. But here's one step removed from that: If you chose to vote no based on one of your communities, that's not really the basis of [Commissioner Maddox's] personal feelings, that was just the feelings of the community. So would that still—is that still considered him basing his decision on the emissions?

-7-

*** 

MS. YORK:  Again, for the record, the act has specific prohibitions.  So I don't—I'm not going to deny that constituents have their right to their opinion.  And if they wanted to come here tonight and express to you their concern about the radiofrequency emissions and what that might cause, that'd be—that would be fine.  But your decision cannot be based on that.[7]

After this discussion, the Board of Commissioners solicited statements from the parties regarding the negotiations between Verizon and the BPU.  A representative from the BPU argued that telecommunications leases have evolved from the early leases that were drafted by, and thus more favorable to, the telecommunications companies.  The representative asserted that the BPU's pricing scheme was nondiscriminatory and was generally based on the amount of ground space used, the amount of coax cable that runs up the tower, and the amount of space that the equipment array takes up on the tower itself.  Verizon's counsel stated that it was "purely the terms of the lease that could not be worked out," and that neither party was willing to compromise on their respective positions.

After one citizen spoke against Verizon's proposal, saying that "a lot of people do not want it for various reasons," Commissioner Kane immediately moved to deny Verizon's application for a special use permit.  The motion was seconded, but the Board's legal counsel informed the Board that the Federal Telecommunications Act requires written denial accompanied by specific reasons for the decision.  Commissioner Kane again moved for denial "for lack of a good faith effort from Mr. Holland and his crew, and that there are other suitable places to put something like this and not in a neighborhood."[8]  Commissioner Barnes seconded

---

[7]     Tr. of Bd. of Comm'rs Meeting (6/2/11), Doc. 18-9, at 9–14.

[8]     *Id.* at 27.

the motion, stating simply, "Not fit for the community."[9]  When the roll call was taken, none of the commissioners cited radio frequency emissions as a reason underlying their vote. Commissioners McKiernan, Murguia, Maddox, Kane, Markley, and Holland voted to deny the application.  Verizon's application for a special use permit was thus denied by a vote of 7 to 2.

The Unified Government issued its written denial of Verizon's application on June 30, 2011.  The written denial stated that Verizon "failed to establish compliance with the Wireless Communication Facilities ordinance" because Verizon's "one hundred twenty (120) foot wireless communication tower is not the least intrusive means of fulfilling any gap in the particular service provided by the petitioner, Verizon Wireless."[10]  As support for that statement, the Board of Commissioners set forth information about Verizon's need for a new WCF, plans for a new tower, collocation efforts,[11] and applicable provisions of the Code.  The Board then stated the following reasons for denying the application: (1) the proposed tower is "not aesthetically attractive in a residential neighborhood and would create blight for the surrounding residential properties"; (2) the proposed tower "does not fit with the character of the neighborhood and is not compatible with nearby zoning and uses"; and (3) the proposed tower is within a half-mile of the BPU water tower, which is a less intrusive option for Verizon's WCF.[12] The written denial makes no mention of radio frequency emissions.

---

[9]     *Id.*

[10]    Written Denial, Doc. 18-15, at 2.

[11]    When describing Verizon's collocation efforts, the Board simply named three sites and the reasons for their rejection, as provided by Verizon.  The Board made no findings of its own with respect to those locations.

[12]    Written Denial, Doc. 18-15, at 2–4.  The Board of Commissioners acknowledged that the BPU water tower is not a communication tower, so it is not included in section 27-593(a)(30)(k)(a)(4)(v), which states that communication towers taller than 80 feet cannot be located closer than a half-mile from another communication tower.

## II.     Legal Standards

### A.     Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[13] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[14] The movant bears the initial burden of proof, and must show the lack of evidence on an essential element of the claim.[15] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[16] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[17] The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[18]

### B.     Federal Telecommunications Act

The Telecommunications Act of 1996 ("TCA") created uniform regulations for the wireless industry and vested enforcement and regulatory authority in the centralized Federal Communications Commission ("FCC").[19] The TCA preserves local government control over

---

[13]  Fed. R. Civ. P. 56(c).

[14]  *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[15]  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[16]  *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[17]  *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000)(citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[18]  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[19]  *See* 47 U.S.C. § 151.

"decisions regarding the placement, construction, and modification of personal wireless service facilities,"[20] but places several limitations on that power.[21] Two of the limiting provisions are at issue here. First, the TCA states, "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."[22] Second, the TCA provides, "No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions."[23]

The TCA permits a party to file suit if "adversely affected by any final action or failure to act by a State of local government."[24] If the district court finds that the State or local government violated the TCA, the court may issue an order instructing the government agency to authorize construction of the WCF.[25] Although the usual procedure for a federal court reviewing

---

[20]   *Id.* § 332(c)(7)(A).

[21]   *Id.* § 332(c)(7)(B).

[22]   *Id.* § 332(c)(7)(B)(iii).

[23]   *Id.* § 332(c)(7)(B)(iv).

[24]   *Id.* § 332(c)(7)(B)(v).

[25]   *See, e.g., U.S. Cellular Corp. v. Bd. of Adjustment of City of Seminole, Okla.*, 180 Fed. App'x 791, 794 (10th Cir. 2006) ("Although the TCA does not provide a statutory remedy for a violation of its provisions, it is well established that injunctive relief is an appropriate remedy for violations of the TCA's procedural requirements." (Citation and internal quotation marks omitted)); *Nat'l Tower LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 21–22 (1st Cir. 2002) ("[I]n the majority of cases the proper remedy for a zoning board decision that violates the Act will be an order, like the one the district court issued in this case, instructing the board to authorize construction."); *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir. 1999) ("[T]he majority of district courts that have heard these cases have held that the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits."); *Bell Atl. Mobile of Rochester L.P. v. Town of Irondequoit, N.Y.*, 848 F. Supp. 2d 391, 403 (W.D.N.Y. 2012) ("Courts have consistently held that a mandatory injunction is an appropriate remedy for violations of the TCA."); *T-Mobile Cent., LLC v. Unified Gov. of Wyandotte Cty., Kansas City, Kan.*, 528 F. Supp.

federal agency decisions is to remand for further proceedings, that relief reflects Congress's decision to commit to a particular federal agency the task of policymaking when federal statutes are unclear.[26]  Issues regarding wireless communication, however, are reserved to the FCC, and remanding to local governments does not comport with Congress's directive that matters involving personal wireless services facilities be promptly decided.[27]  Therefore, if the Court finds that the Board of Commissioners violated the TCA when it denied Verizon's application for a special use permit, the appropriate remedy would be for the Court to order the Unified Government to grant the special use permit.

## C.     Unified Government Code of Ordinance

Because the TCA places only the enumerated limitations upon local governments considering the placement of WCFs, local ordinances control the government entities' decisions to the extent they do not conflict with the TCA.[28]  Unified Government of Wyandotte County's Code of Ordinance section 27-214(f)(5) sets out the factors ("the *Golden* factors"),[29] that the Board of Commissioners is to consider with respect to applications for special use permits, such as the character of the neighborhood, whether the proposed use is reasonably necessary for the

---

1128 (D. Kan. 2007), *accord* 546 F.3d 1299, 1303 (10th Cir. 2008) (The court entered its judgment declaring the above and granting injunctive relief by ordering the Unified Government to approve T–Mobile's application.").

[26]    *See Nat'l Tower LLC*, 297 F.3d at 21.

[27]    *See* 47 U.S.C. § 332(c)(7)(B)(v); *see also SPRINTCOM, Inc. v. Puerto Rico Regulations and Permits Admin.*, 553 F. Supp. 2d 87, 96 (D. P.R. 2008) (overturning a district court's order remanding a WCF zoning issue to the local government, and instead ordering the local government to issue a variance and any applicable permits needed to construct the WCF to the wireless provider).

[28]    *See T-Mobile Cent., LLC v. Unified Gov. of Wyandotte Cty., Kansas City, Kan.*, 546 F.3d 1299, 1307 (10th Cir. 2008) (citations omitted) ("[T]his Court must look to the requirements set forth in the local zoning code to determine the substantive criteria to be applied in determining whether substantial evidence existed to support the Board's decision.").

[29]    *See Golden v. City of Overland Park*, 584 P.2d 130, 135–37 (Kan. 1978).

convenience and welfare of the public, potential nuisances and pollution, and compatibility with existing and proposed land uses in the surrounding area.  Additionally, Section 27-593(a)(30) of the Code is an exhaustive local ordinance governing the placement and construction of WCFs. The Unified Government's written denial of Verizon's application for a special use permit cited, without explanation or discussion, four provisions within the WCF section of the Code.

First, section 27-593(a)(30)(j)(v) states that all WCFs "shall be sited to have the least intrusive visual effect, as is practical, on the environment and adjacent properties."[30]  The section does not clarify whether the term "sited" refers to the initial selection of a location for the WCF or the specific placement of the WCF within the bounds of a previously-selected location.

Second, section 27-593(a)(30)(k)(a)(1) prohibits the construction of a new communication tower "unless the applicant demonstrates, based on substantial evidence and to the reasonable satisfaction of the city, that no existing communication tower or other collocation structure can accommodate the wireless service provider's proposed wireless communication facility."[31]  To meet its burden, the applicant may introduce evidence of "limiting factors . . . that render existing communication towers or structures unsuitable for the wireless service provider's needs."[32]  The Code does not define or offer examples of conditions that would make a tower or structure "unsuitable."

Third, section 27-593(a)(30)(k)(a)(4)(v) states that communication towers taller than 80 feet cannot be located closer than a half-mile from another communication tower.  A "communication tower" is defined as a structure "constructed for the primary purpose of

---

[30]   Unified Gov. Code of Ordinance, Doc. 18-11, at 4.

[31]   *Id.* at 5.

[32]   *Id.* at 5.

placement of antennas for the transmission and distribution of radio frequency signals."  Water towers are not communication towers, but collocation structures.[33]

Fourth, section 27-593(a)(30)(h) provides a table illustrating the level of approval required to build a communication tower on property within the various zoning areas in Wyandotte County.  Neither party disputes that Verizon was required to obtain, subject to the requirements of section 27-593(a)(30), a special use permit for the proposed tower.

## III.    Analysis

Verizon argues that it is entitled to summary judgment under the TCA because the Unified Government's denial of Verizon's application for a special use permit was (1) not supported by substantial evidence in the record, and (2) based at least in part on concerns about the effects of radio frequency emissions.  The Unified Government disputes both of these allegations, and contends that it is then entitled to summary judgment because there are no genuine issues of material fact.  The Court concludes that the Unified Government's decision is not supported by substantial evidence in the record, and therefore violates the TCA, entitling Verizon to summary judgment and the requested injunctive relief.

## A.    The denial of Verizon's application for a special use permit is not supported by substantial evidence in the record.

Section 332(c)(7)(B)(iii) of the TCA requires local governments denying requests for new WCFs to base their decision on "substantial evidence contained in a written record."[34] "Substantial evidence" is such evidence that a reasonable mind would deem adequate to support

---

[33]    *Id.* at 2.

[34]    47 U.S.C. § 332(c)(7)(B)(iii).

the decision-maker's conclusion.[35]   It requires more than a scintilla, but less than a preponderance of evidence.[36]  Courts must exercise deference towards the findings of the lower tribunal under a substantial evidence standard, but need not wield a "rubber-stamp."[37]

The written denial issued by the Board of Commissioners in this case is less than clear because does not distinguish between its reasons for denying Verizon's application and the findings that support those reasons.  Nevertheless, the Court agrees with Verizon's interpretation of that document, deducing the following three reasons for denial: (1) the proposed tower is within a half-mile of the BPU water tower, which is a less intrusive option capable of collocation; (2) the proposed tower is not aesthetically attractive in a residential neighborhood and would create blight for the surrounding residential properties; and (3) the proposed tower does not fit the character of the neighborhood and is not compatible with the zoning and uses nearby.  For the following reasons, the Court finds that the record lacks substantial evidence to support any of the Unified Government's stated reasons for denial.

### 1.      *Reason One: The BPU Tower's Superiority*

The written denial from the Board of Commissioners begins by stating that Verizon's proposed tower "is not the least intrusive means" of correcting the coverage gap, and later states that the tower "is within ½ mile of a water tower owned by the Board of Public Utilities which is a less intrusive option capable of collocation and able to accommodate Petitioner's service

---

[35]   *T-Mobile Cent.*, 546 F.3d at 1307 (citation omitted).

[36]   *Id.*

[37]   *Id.* at 1306–07 (citation omitted).

needs."[38]  But the distance and nature of the BPU tower as compared to Verizon's proposed site are irrelevant.

First, although Code § 27-593(a)(30)(k)(a)(4)(v) states that communication towers taller than 80 feet cannot be located closer than a half-mile from another communication tower, water towers are not communication towers under that provision.[39]  Therefore, the distance between Verizon's proposed site and the BPU tower is a moot point regardless of any supporting evidence.

Second, as the Tenth Circuit held in another case against the Unified Government, the Board of Commissioners can apply only those criteria contained in the local zoning ordinance when deliberating the construction and placement of a new WCF.[40]  The Unified Government argues that section 27-593(a)(30)(j)(v) permits an inquiry into the least intrusive option.  That section states, "All wireless communication facilities shall be sited to have the least intrusive visual effect, as is practical, on the environment and adjacent properties."[41]  Verizon argues that the word "sited" refers to the specific location of a tower within the proposed plot of land.  The Unified Government, on the other hand, argues that "sited" applies more broadly to the general selection of a site for a WCF.

The Court disagrees with the Unified Government's assertion that Verizon's use of the word "sited" is incompatible with other provisions of the Code.  In section 27-593(a)(30)(b), the purpose of the ordinance could very well be to ensure that towers are placed in the specific

---

[38]    Written Denial, Doc. 18-15, at 2, 4.

[39]    Unified Gov. Code of Ordinance, Doc. 18-11, at 2.

[40]    *T-Mobile Cent.*, 546 F.3d at 1310 n.5.

[41]    Unified Gov. Code of Ordinance, Doc. 18-11, at 4 (emphasis added).

position on the proposed location to ensure compatibility with the surrounding area.  The plain language of the word is similarly dichotomous.  When used as a transitive verb, the word "sited" means "to situate or locate on a site," and the usage example—which is only a fragment—appears to employ the broader definition advocated by the Unified Government.[42]  But the word "situate" means "to place in a *certain* spot or position; locate," and the usage example provided states, "The statute is situated in the center of the fountain."[43]  The foregoing sentence uses the definition of "sited" advocated by Verizon—the location is the fountain and the statute is sited at its center.

It is uncontested that the Planning Commission's staff report found that Verizon's "120 foot tower would have a significant visual impact on the area" and that "[t]he community is bearing the aesthetic brunt of an unnecessary new tower."[44]  The new tower therefore represents an intrusion.  If the Court applied Verizon's definition of "sited" in section 27-593(a)(30)(j)(v), the Court would have to conclude that the Unified Government's decision lacks substantial evidence because there was little to no discussion of the precise placement of the tower on the proposed property.  Even if the Court applied the Unified Government's broader definition, however, the finding that the BPU water tower is less intrusive is not supported by substantial evidence.[45]

---

[42]   *The American Heritage Dictionary of the English Language* 1639 (5th ed. 2011).

[43]   *Id.* (emphasis added).

[44]   Planning Comm'n Staff Report (2/14/11), Doc. No. 17-3, at 3–4.

[45]   In its memorandum, the Unified Government refers to several water towers other than the BPU tower located at 1415 North 40th Street.  But the written denial states without dispute the reasons those locations were denied, and the only tower the Board explicitly found to be less intrusive was the BPU water tower.  *See* Written Denial, Doc. 18-15, at 4.

First, the existence of other water towers in addition to the BPU tower located at 1415 North 40th Street is irrelevant.  The written denial from the Board of Commissioners states without dispute the reasons that Verizon declined to use those locations.  Other than expressing its displeasure at the number of water towers surrounding the proposed site, the Board never contested Verizon's assertions that those locations were inadequate to address the service gap.[46] As a result, the only water tower at issue is the BPU tower.

Section 27-593(a)(30)(j)(v) requires that WCFs must have "the least intrusive visual effect, *as is practical*."  The Code does not clarify the meaning of "practical," so the Court will employ its plain meaning of "having or showing good judgment; sensible."[47]  Here, Verizon and the BPU negotiated for months to enter into a mutually-acceptable leasing contract, but the parties could not come to an agreement.  Verizon alleged that the terms proposed by the BPU were less favorable to the wireless company than terms offered by other collocation owners.[48] The BPU representative who testified at the June 2, 2011, hearing did not dispute that assertion; she simply provided historical justification for the BPU's actions and explained their pricing scheme.  In fact, the Planning Commission's staff issued a report stating: "[Verizon] made several attempts to negotiate with the Board of Public Utilities to be on a water tower nearby.  If the staff felt like [Verizon] did not have valid issues with the negotiation, we would likely have a

---

[46]    *See* Tr. of Bd. of Comm'rs Meeting (6/2/11), Doc. 18-9, at 16 ("And instead of putting it in the commercial area, instead of putting it with the other water towers, you selected a site that is among people's homes.").

[47]    *The American Heritage Dictionary of the English Language* 1383 (5th ed. 2011).

[48]    The Unified Government argues at length about the BPU's statutory duty to offer non-discriminatory pricing.  But that provision merely ensures that the BPU will not discriminate between wireless providers.  It does not require the BPU to offer the same rates as the owners of other collocation structures.

different opinion on this case."[49]  Other than unsubstantiated accusations from members of the Board of Commissioners,[50] there is no evidence in the record to cast doubt upon Verizon's claims that the proposed site presented a better investment than the terms of the BPU's lease.  In these circumstances, it would not be sensible for Verizon to bind itself to lease terms that are less advantageous than the market rate.  Therefore, although construction of a new tower represents a visual intrusion, Verizon met its burden of proving that any less intrusive structure was not practical.  The record does not contain substantial evidence to support the Board of Commissioner's findings to the contrary.

Making a similar argument in its motion for summary judgment, the Unified Government contends that Verizon is not entitled to relief because it did not meet the requirements of Code § 27-593(a)(30)(k)(a)(1).  That section prohibits new communication towers unless the wireless provider can prove "that no existing communication tower or other collocation structure can accommodate the wireless service provider's proposed wireless communication facility."[51] Section 27-593(a)(30)(k)(a)(1) is satisfied if the wireless provider can show that the existing structure is "unsuitable for the wireless service provider's needs."[52]  The Unified Government argues that Verizon's failure to negotiate a lease with the BPU does not render the BPU water tower "unsuitable" under the Code.  For the reasons discussed in the preceding paragraph, the Court finds that Verizon met its burden of proving that the BPU tower was unsuitable for

---

[49]   Planning Comm'n Staff Report (2/14/11), Doc. No. 17-3, at 4.

[50]   *See, e.g.*, Tr. of Bd. of Comm'rs Meeting (6/2/11), Doc. 18-9, at 6 ("In my mind, you never ever wanted to reach base with them . . . .  I don't think you ever intended to meet in the middle.  You just knew that you've got enough stuff and you'll get a pass and we'll just ram it down your throat.").

[51]   Unified Gov. Code of Ordinance, Doc. 18-11, at 5.

[52]   *Id.*

Verizon's needs.  Although a few members of the Board of Commissioners expressed their belief that Verizon did not negotiate in good faith, the Board's own staff made a contrary conclusion after reviewing the parties' attempts at negotiation.  Despite Commissioner Brandau-Murguia's optimistic belief that "anything can be worked out,"[53] the records in this case clearly indicate that Verizon and the BPU were intransigent in their positions regarding several lease provisions. Simply put, they were not going to reach a mutually acceptable agreement.  The BPU's water tower was therefore an unsuitable collocation structure for Verizon's needs.[54]

In conclusion, although Verizon's proposed tower constitutes a visual intrusion, Verizon met its burden of proving that the BPU water tower was neither a suitable nor practical collocation.  Because there is no substantial evidence in support of its conclusion to the contrary, the Board of Commissioners erred in denying Verizon's application for a special use permit on the grounds that the proposed tower was not the least intrusive option.

## 2. *Reason Two: Aesthetically Unattractive, Creating Blight*

The Board of Commissioners also based its denial on the finding that Verizon's "120 foot tower is not aesthetically attractive in a residential neighborhood and would create blight for the surrounding residential properties."   In another case involving the Unified Government, the Tenth Circuit rejected identical language on the grounds that "[m]ere generalized concerns regarding aesthetics are insufficient to constitute the substantial evidence justifying the denial of an application to construct a wireless telecommunication facility."[55]   Here, the Unified

---

[53]     Tr. of Bd. of Comm'rs Meeting (6/2/11), Doc. 18-9, at 24.

[54]     *See Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 53 (1st Cir. 2009) (upholding a trial court's conclusion that a wireless carrier's proposed site was the only feasible site because, although other sites were available, the wireless provider was unsuccessful in negotiating financial agreements with the owners of those sites).

[55]     *T-Mobile Cent.*, 546 F.3d at 1312 (citations omitted).

Government does not point to anything in the record to support their finding. In fact, the Planning Commission's February 14, 2011, Staff Report concludes that Verizon's proposed WCF tower posed no risks of noise, vibration, dust, illumination, pollution, overcrowding, decreased marketability of surrounding properties, or damage to irreplaceable natural resources.[56] Furthermore, Verizon exhibited a willingness to mitigate some of the visual impact, submitting a landscape plan that would purportedly protect the view from parcels to the northeast of the tower.[57] Accordingly, the Board's finding that Verizon's proposed tower is aesthetically unappealing and a blight is unsupported by substantial evidence in the record.

### 3. Reason Three: Incompatible with the Neighborhood

Finally, the Board of Commissioners made findings related to the area surrounding the proposed site of the WCF tower, concluding that the tower is incompatible with the residential nature of the neighborhood. The *Golden* factors permit the Board to consider the compatibility of the existing and proposed land uses in the surrounding area.[58] The Planning Commission's April 11, 2011, Staff Report states that the areas to the north, east, and west of the proposed tower location were zoned as single-family districts, and they were being used for residential purposes and single-family housing. The report goes on to conclude, "A communications tower is not suitable within the residential area. Although the lot is zoned commercial, its use is residential."[59] The report does not, however, offer a reason as to why the tower is not suitable in

---

[56] Planning Comm'n Staff Report (4/11/11), Doc. No. 18-3, at 3–4.

[57] Planning Comm'n Staff Report (2/14/11), Doc. No. 17-3, at 11.

[58] *See* Unified Gov. Code of Ordinance § 27-214(f)(5)(g), *available at* http://www.wycokck.org.

[59] Planning Comm'n Staff Report (4/11/11), Doc. No. 18-3, at 3.

the area. The only effect identified in the report as affecting the neighborhood is the visual impact of the tower.

Furthermore, as the Tenth Circuit previously informed the Unified Government, "the Code authorizes the Board to consider 'compatibility' with existing uses, not the directness of the relation to existing uses."[60] Although a WCF tower is not directly related to the uses of residentially-zoned property, the fact that the tower will have no adverse effect on the neighborhood means the two uses are compatible. As evidence of their compatibility, the Planning Commission and its staff twice recommended that the Board of Commissioners grant Verizon's application for a special use permit, despite the finding that the tower is not suitable in a residential neighborhood. Furthermore, no one attended the neighborhood meeting regarding Verizon's proposed tower to speak out against the project, and only one resident objected, without explanation, to the tower during the public hearing on June 2, 2011. Therefore, the written record lacks substantial evidence to support the finding by the Board of Commissioners that Verizon's proposed WCF tower conflicts with the nature and use of the surrounding properties.

Because none of the reasons cited by the Board of Commissioners as reasons for denying Verizon's application are supported by substantial evidence in the written record, the denial violated § 332(c)(7)(B)(iii) of the TCA and must be reversed.

**B.      The Court need not decide whether the Board based its denial on concerns about the effects of radio frequency emissions.**

Section 332(c)(7)(B)(iv) of the TCA prohibits local governments from regulating the placement and construction of WCFs on the basis of the perceived effects of radio frequency

---

[60]   *T-Mobile Cent.*, 546 F.3d at 1312.

emissions so long as the WCFs comply with FCC standards regarding such emissions.[61] Unlike the reasons presented in the Board's written denial, the written record in this case does contain substantial evidence that the commissioners were concerned about the effects of radio frequency emissions.[62] And although the written denial did not reference radio frequency emissions, almost 25% of the written transcript from the June 2, 2011, hearing discusses radio frequency emissions.[63] Particularly troubling to the Court is the fact that Commissioner Brandau-Murguia asked, "What if we are basing it on the way it looks?" followed by Commissioner Barnes's apparently facetious comment about disliking the color brown.[64] Furthermore, it is not clear that Ms. York provided a correct response to Commissioner Barnes's question about whether the commissioners could base their decision on their constituents' concerns about radio frequency emissions if the commissioners themselves had no concerns about the emissions. The TCA affords the FCC the sole authority to set standards regarding radio frequency emissions from WCFs. Although local governments may require WCFs to comply with the FCC's emission standards, they cannot impose their own standards on wireless providers by basing zoning

---

[61]    47 U.S.C. § 332(c)(7)(B)(iv).

[62]    *See SPRINTCOM, Inc.*, 553 F. Supp. 2d at 93 ("[T]he Court finds that the only substantial evidence on the written record is that of the site neighbors' concerns related to the effects of radio-frequency emissions. The written record lacks substantial evidence in support of any other reason for the denial of the Preliminary Plan and variance.").

[63]    *Cf. Nextel West Corp. v. Town of Edgewood, N.M.*, 479 F. Supp. 2d 1219, 1239 (D. N.M. 2006) (finding that the denial of a permit was not based on concerns about the effects of radio frequency emissions because the written denial did not mention emissions *and* the hearings did not "suggest an impermissible focus on radio frequency emissions").

[64]    Tr. of Bd. of Comm'rs Meeting (6/2/11), Doc. 18-9, at 12, 14. On the audio recording of the hearing (Doc. 19), laughter is heard after Commissioner Barnes's statement.

decisions on mere concerns—from the public or government officials[65]—about the effects of emissions.[66]

Therefore, although the written denial contains no mention of the effects of radio frequency emissions and Ms. York informed the Board about the TCA's prohibition against denying zoning based on emissions, the statements and discussion at the June 2, 2011, hearing are troubling.  Having found, however, that the Board's denial of Verizon's application violated § 332(c)(7)(B)(iii) of the TCA, it is unnecessary for the Court to further address Verizon's argument that the Board based its denial on concerns about the effects of radio frequency emissions.

**IT IS ACCORDINGLY ORDERED** this 23rd day of January, 2013, that Plaintiff's Motion for Summary Judgment (Doc. 20) is **GRANTED**, and Defendant's Motion for Summary Judgment (Doc. 24) is **DENIED**.  Judgment shall be entered for the Plaintiff, and Defendant is hereby ordered to approve Plaintiff's application for a special use permit to construct a new communication tower at 1500 North 38th Street, Kansas City, Kansas 66102.

**IT IS SO ORDERED**.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[65]   *See SPRINTCOM, Inc.*, 553 F. Supp. 2d at 93 (finding a violation of the TCA when *neighbors* voiced concerns about radio frequency emissions at a public hearing).

[66]   Brian W. Blaesser & Alan C. Weinstein, *Federal Land Use Law & Litigation* § 10:9 (2012).